Iancu. Good morning, Your Honors, and may it please the Court. The Board's construction of the R-ranked limitation is unreasonable because it is not consistent with the intrinsic record. The Board stated that the ranking occurs only in the context of the claim comparison and that the most problematic phenotype is ranked according to how similar it is to the executing computer program, but this is not how the claimed invention works. Can I ask you this? So I'm inclined to think that that paragraph on page 11 of the Board's opinion is rather central both to what it was thinking became central to the Director's characterization of the patent and became seemingly central to the reason for finding the two pieces of prior art sufficient to find unpatentability here. Yes, Your Honor. It's not clear to me whether that's quite the issue that in most of your blue brief you have framed about timing. That is, mostly you say the ranking has to occur before the comparison. That is correct, Your Honor. And what you just said, which has struck me in preparing the case as kind of the heart of what's going on, is that the Board had the wrong notion of ranking in mind, ranking by similarity distance as opposed to ranking the things in the library by whatever information you can get about the level of peril. And I guess I'm concerned about the extent to which you've really preserved and presented the argument that you're making now. Your Honor, the Board's error with respect to focusing on the similarity distances as giving rise to the ranking is what led directly to its error on the timing question. Your Honor is correct that we have not challenged the construction of the term ranking as including or not including similarity distances. What we have challenged is the Board's construction of the R-ranked limitation as allowing the ranking to occur during or after the clean comparison. I guess my problem with that is that it seems to me that you could have a post-comparison ranking that's different from ranking according to similarity of the test subject. By saying, we've just figured out which one this is like. We haven't yet looked through our library of phenotypes and decided which of those phenotypes are really, really dangerous and which less so. Now we're going to figure that out and then take action. Your Honor, in theory you could have that, but you couldn't have that in the context of the claimed invention here. And the reason for that, Your Honor, begins with the claim language. That in the comparing limitation, the action that is described here is comparing the plurality of malicious behavior indications to a predetermined collection of malicious behaviors, referred to as a phenotype. And then that claim limitation goes on to tell us several characteristics of a phenotype. One of those characteristics is that it comprises a grouping of specific genes that are typically present in a type of malicious code. Another characteristic is that the phenotype is one of a number of phenotypes. And that class of phenotypes are ranked to create increasing levels of confidence that a runtime object is executing a behavior pattern comparable to a known family of malware. There is no disclosure in the claim language or elsewhere in the intrinsic record of calculating these rankings either on the fly or after the claim comparison. Rather, both the structure of the claim language and then the description of the ranking and this behavioral monitoring process in the specification and the prosecution history shows that these rankings must exist before the comparison. Because all that you do is to detect a phenotype and when that phenotype matches one of the existing phenotypes in the database, you determine whether that phenotype has the predetermined level of confidence necessary to trigger a content analysis. If you could calculate that level of confidence on the fly and go back while your system is under attack to figure out whether these stored phenotypes are sufficiently likely to indicate malware to trigger a content analysis, there would be some description in the claims or in the specification of this process happening during the comparison process. But there is no such description. All you do is make a comparison, look for a match, and if the matched phenotype has the predetermined level of confidence necessary to trigger a content analysis, you then proceed to the content analysis. Can I just, I guess going back to where Judge Toronto started, try to understand what really the argument, I mean, frankly, my read of the briefs is that this is very much just a timing. Does this occur before? Does this occur after comparison? Does this occur during comparison? Yes, Your Honor. But it seems like the heart of the question isn't really what is the timing of the ranking, it's a question of what is the ranking? What are you ranking? Am I right about that? Your Honor, you are right that part of the issue is what is the ranking, but it is understanding the character of the ranking that directly leads to an answer on the timing question. Because in your view of what ranking is, it clearly precedes and is separate and apart from the comparison step? Yes, Your Honor. The reason for that is because one, the claim language is written in a way that uses our rank as an adjectival phrase that indicate that the ranking happened before the claim comparison. Two, there's no disclosure anywhere of conducting the ranking process on the fly during or after the claim comparison. Three, Your Honor, the patent office has not given any reason to reject Safas' construction other than its view that the ranking constitutes a calculation of levels of similarity. Once you've dispelled that notion, you see that, for example, you can accomplish the stored phenotype, and if you get an exact match and that matched phenotype has the level of confidence necessary to trigger a content analysis, then you've performed those steps of the method. However, we know from the claim language that you need to have a number of phenotypes that are ranked. How could you have a number of phenotypes that are ranked if you've only performed the board's view that you calculate these rankings on the fly? The only way you could have a number... Yes, Your Honor. I guess it just comes back to what I started with and the chief followed up on. I am inclined at the moment to think that it is just dead wrong to characterize what is going on here in the way the director does and the way the board did in the middle paragraph on 11. This is not about similarity distances between elements of the library, the phenotype library, and the thing. What I'm trying to figure out is whether you have given us a fair opportunity to... Whether you've preserved that point here. And I take it that the government's argument, as I understand it, is because it's tied to similarity distance, the ranking actually cannot occur earlier, and the board didn't even say that. Correct, Your Honor. So, but yet you have made your argument mostly, maybe not entirely, this is kind of what I'm trying to figure out, in terms of whether the ranking can occur earlier or even has to occur earlier. But I don't really understand why a correct ranking of the phenotypes in the library without regard to the test subject couldn't occur just after the comparison. Right. Your Honor, you are correct on how we've characterized the issue as a timing issue. We did preserve the challenge to the board's and the patent office's understanding of how the invention works by discussing it in our opening and reply briefs. But you are correct that we are framing this in terms of a timing issue, and our position is that the ranking of the stored phenotypes must occur before the claim comparison. And Your Honor, this is not a case of lexicography or disavowal. This is the type of case where we look at the claim term, we believe that the claim term has a plain meaning based on the claim language alone. However, even if the court finds some grammatical ambiguity there, this is one of those cases like trivascular and the suit on source case that the patent office cites. And Microsoft v. Proxicon, where you need to look and say, is the way that the board construed this limitation consistent with the specification in that it doesn't correspond— Can I just take you back? Yes, Your Honor. Because a lot of this is not getting to what I understand the heart to do, part of what Judge Toronto is struggling with, and I think I share that, which is you keep going back to the timing. Is it because the way you've chosen to characterize it as before the comparison is synonymous with the argument we've been talking about is, let's talk about what your ranking and what the ranking is, and that it's not vis-a-vis the comparison, it's separate and distinct between the phenotypes in the library? Your Honor, those two issues are not synonymous. We think that once you have the correct understanding of how the claimed invention works, that these rankings are not similarity distances, rather they correspond to levels of confidence that malware is likely present. Once you understand that, we believe that that gets you a long way toward the correct construction here. So what you're saying is, you have to understand what's being done in order to understand why the timing matters. That is correct, Your Honor. And then, once we get to that point, we have more work to do in order to show that this claim term should be temporally limited to ranking occurring before the claim comparison takes place. And Your Honor, as we described in our briefs, the claims, the specification, and the prosecution history... Well, what does the specification add? I mean, the board referred to it. It's ranked as used once in the specification, right? And it's not clear to me that that paragraph adds much. Your argument, right? Your Honor, the most probative portion of that paragraph is the specification's description of an example of how this comparison process works. And the specification says, at Appendix 58, Column 18, Lines 34 to 41, that including greater combinations of behaviors in the phenotype database may enable more detailed analysis of a suspicious code. It gives us an example of that analysis. For example, an analysis of a suspicious code may be moved from accessing the registry in this location is bad to this process is exhibiting the same behavior as the family of malware conficker, based on a comparison of a detected phenotype with an existing phenotype. So, as the specification describes it, all you're doing in this process is comparing the detected phenotype, the runtime object, with the existing stored phenotype, and that comparison alone, without any on-the-fly ranking, is going to enable you to draw a conclusion that this behavior is bad, or that this series of behaviors is so bad that we think it's probably this particular family of malware, and then you look to see whether that probability is high enough to trigger a content analysis. If those assessments of how likely the series of behaviors is to be malware could be calculated on the fly, one would expect to find some description of that in the intrinsic record. Instead, what you have is only the discussion of these predetermined collections of malicious behaviors. The phenotypes that the prosecution history says are created and ranked, and that are then stored in the database. The word predetermined applies to the collections that define each phenotype, right? Not the rankings. Correct, Your Honor. If the intrinsic record contained the phrase predetermined rankings, we probably wouldn't be here. The predetermined collections are part of the evidence that, when taken together, makes it unreasonable for the board to conclude that you can actually perform this ranking on the fly during the comparison in the claims at issue. I would like to reserve the rest of my time for rebuttal, Your Honors. Thank you. May it please the court. I'd like to start with the questions from Judge Tronto and Chief Judge Prost. The problem here, there was a lot of discussion of what's not in the specification, and the about how this ranking works. It's not at all clear. Column 18 is not bad. I'm sorry, what's that? Column 18 is not bad in describing things. Well, I think I disagree with that. So I was looking at it this morning, and even the one time the word ranked is used in column 18, it's actually, it doesn't seem to me to be talking about the ranking that Safos is now talking about. It's talking about behaviors that may be ranked, and the behaviors are the genes, the smaller bits that are compiled. I wasn't sure that word, you're looking at the same thing I am, that word that between behaviors and may felt to me like it was a typo and should be and. It should be? And. And. That may be right. But either way, I think that it's the behaviors that are being talked about in this sentence, the individual behaviors within a phenotype, and not separate phenotypes being ranked. There's no discussion in this specification at all of separate phenotypes being ranked. And so all we have after that is just the claim language itself. And the claim language itself talks about the ranking happening. Well, it says to create increasing levels of confidence that a runtime object is executing a behavior pattern comparable to a known family of malware. So within the claim itself, all we have is that it has to be relative to something that we wouldn't have known ahead of time. There wouldn't have been a runtime object ahead of time to compare to. So the so I think the specification is really of no help here. And similarly, I guess, Sophos talks about the scaled analysis also as potentially being relevant to the ranking and the scale, scaled, scaled analysis analysis that's also in column 18. And that also seems to me to be talking about an analysis within an individual phenotype of the genes within that phenotype, not comparing different phenotypes to each other. And furthermore, the specification does talk about how the phenotypes are designed to represent a family of malware. So you have so it just doesn't make sense that you would rank them relative to each other when you already know that each one represents a family of malware. What about the language in the prosecution history that at least seems to indicate pretty clearly that the phenotypes are created and ranked at the same time? So that is also relative to the I don't think it indicates that they're created and ranked at the same time. It indicates that they are created and they are ranked. And then it adds on the same language that's in the claim of to create increasing levels of confidence that a runtime object is executing a behavior pattern comparable to a known family of malware. So it again is talking about a runtime object that is executing some behavior that you wouldn't have known ahead of time. But it says the content analysis is then performed. So clearly they were talking about the phenotypes being created and ranked before the content analysis is performed, right? That's right. The content analysis is performed after so that's the triggering step. So you have the comparing step first, which is you see whether you're above this certain threshold of malicious behavior. And if you're above the threshold, then you do a deeper dive. You do a content analysis to see if you should be fixing something, stopping the program, something like that. So the point is that the content analysis isn't performed until after the comparing step is done. Right. So you're saying that the board actually reached the conclusion that it could not be beforehand. That's right. I think that is how the board's decision reads. I mean, certainly it's broad enough to include the present time. But it seems to more or less preclude the past. And that's the position you take in your green brief. That's right. And if you look at the board's decision, for example, at page 11 of the joint appendix, I guess the paragraph after the one you were talking about before, the third paragraph. Oh, I'm sorry. That's not the one I wanted to look at. For that middle paragraph on page 11 seems to me the statement of what it had in mind that this invention is about. And that's what you then defend it on. That's right. And the paragraph I meant to point to, I'm sorry, was on page 13 of the joint appendix where the board says in the full paragraph on that page, I guess the last sentence, it says that phenotypes are already ranked prior to the comparison does not make sense when the claim as a whole is read because the purpose of ranking the phenotypes is to assess the risk that the runtime object is malware, not to assess the risk that the predetermined phenotype is malware. Right. But I guess that strikes me as almost nonsensical. That is, if you had a library of ranked phenotypes ranked according to just how bad the malware they might be like is, then the purpose of comparing the object, the runtime object to that library is to figure out if it's like the really bad one or the not so bad one. Well, it satisfies the purpose perfectly well. There's nothing in the specification that says that different malware is better or worse than other malware. And I think that would be, as we put it on our brief, I think it would be pretty hard to say that. I mean, different types of malware do different harmful things. And the purpose is to figure out if the thing that you're looking at is any type of malware and if so, what family is it from? So the ranking ahead of time, I mean, I suppose potentially it could be ranked according to how bad the malware is ahead of time. But I don't know. That seems like a very subjective judgment and would depend a lot on the user and what their preferences are. And regardless, you would want to be combating any kind of malware that you've already determined is a virus. But you might want to combat it in different ways. It doesn't the last element of the claim say something about taking some action? Yes, absolutely. Different actions, shut the thing down or keep going, but take care of it soon. Oh, right. Absolutely. But what you do depends on the family of malware and what its sort of attack is. So you might want to shut down the program or you might want to, I mean, I don't think it's envisioning keeping going but ending soon. But certain types of malware might be affecting your hard drive and other types might be affecting your outlook contacts or sort of trying to figure out information about you. And so the reaction that you would have would be different. But I don't think it's because one's better and one's worse. It's because their route of attack is different. And like I said before, there's nothing in the specification to indicate what kind of ranking is happening. And so I agree that there's a lot of inference on the part of the board and on our part in terms of how this invention works. I don't think that should inure to the patentee's benefit that they fail to describe what's happening in the ranking step. If the court has no other questions, I'm happy to yield the rest of my time. Can I just ask, do you think it is open to us to decide whether your characterization of ranking as being a similarity distance, which also appears in the crucial paragraph on page 11 of the board's decision, is right or wrong? I think definitely the crux of Sophos' argument is when the timing of the ranking. They don't exactly dispute the question of what is being ranked. But I mean, I think that's a hard question because it is in some ways wrapped up in the timing question. OK. Your Honor, I would like to make three points that all relate to the important issues of claim destruction methodology at the heart of this appeal. First, the parties agree that this is not a situation where you have a plain meaning in the claim language and you're simply looking to see if the patentee can derogate from that. Through lexicography or disavowal. Rather, the parties agree, as the patent office says, that you need to draw some inferences here from the intrinsic record as a whole. If there's a 112 problem, that's not before the patent office or this court in an IPR. Second, one of the tools of construction that is valuable here is illustrated in the tuner processors case that the parties discussed in the briefing. Forget about the cases. Let's talk about the specifics here. Yes, Your Honor. Where in the patent is there a description of what exactly constitutes ranking? And does something in the patent describe identifying one phenotype in the library as in some way, I'm going to use better and worse to mean higher or lower on whatever the scale is, which I assume is implicit in ranking. So is there something that tells us that? I think Ms. Silfen said there really isn't anything in the patent that does that. So when you try to figure out what it means, it's not a bad guess to say it's a similarity comparison. Your Honor, there are two places in the patent that do not expressly define ranking, but give us a very strong indication of what a ranking is. The first is in the claim language. At appendix 61, column 24, the triggering step that begins at line 16, where we trigger a content analysis if we find a match and the stored phenotype that is matched by the runtime object is, quote, one of the number of phenotypes having a predetermined level of confidence that the executing computer process contains a known family of malware. That level of confidence is a ranking. And we calibrate the system. It could be expressed in terms of a percentage. It could perhaps be a color-coded system. But the point is that the system is calibrated to a certain level of confidence, and then it's the ranking. That level of confidence is being applied to the runtime object. So what in the patent describes what I took it to be your notion that the elements of the preexisting library are ranked with respect to each other in some way? Yes. Your Honor, they are ranked according to the level of confidence that that particular phenotype is an indication of malware. It doesn't mean, Your Honor, that there necessarily needs to be... Where does it say that? In this triggering limitation in the claim language, where the phenotypes have a level of confidence associated with them. It's not necessarily an ordinal ranking of 1, 2, 3, 4, 5. It could be ranks like you might have in the military or on a yellow, orange, red front scale. You said you had two things. Yes. Your Honor, the second is in the example from the specification that I previously read, which gives us information when we find a match, like accessing the registry in this location is bad, or this process is exhibiting the same behavior as the family of malware config. You can look at those assessments of, this is bad, as being a type of ranking. It could be translated more precisely into a percentage level of probability that we have malware when a runtime object is trying to perform that behavior. And by the same token, when you detect a series of behaviors, a phenotype, and you say, aha, this is a dead ringer for conficker, that is itself a ranking in the sense that you're getting a level of confidence from that, that it's malware. One last question. Yes, Your Honor. Is there a relationship between the is stored language in the monitoring step and the are ranked language that we're talking about here? Yes, Your Honor, there is. That's where the parallel to the tuna processor's case comes in. We have the advantage in this claim language of having a very, very similar grammatical structure in the monitoring step. It talks about comparing an operation with a predetermined behavior referred to as a gene, just like we saw with phenotypes in the comparing step. And then at column 23, line 67, the patent says, where the gene is stored for reference in a database and wherein the gene relates to at least one of several activities. And we see this exact same grammatical structure that's used in the comparing step being used in the monitoring step and clearly referring to actions that occurred in the past is stored or to present characteristics of the gene that were attributed to it before the monitoring step was performed. And therefore, we have a parallel structure to which we can connect the grammar in the comparing step. And therefore, the context of the claim language gives us a very strong indication that the phenotypes must be ranked before the claim comparison. And Your Honor, this is where the important claim construction methodology comes in. In the court's recent decision in M. Ray Smith International, the court said in determining whether the patent office's construction is reasonable, you don't just ask, does the specification preclude this construction? You don't even just ask, is the patent office's construction not inconsistent with the specification? Rather, you need to say, is the construction consistent with the specification in that? Does it correspond to how the inventor described the operation of the invention in the patent? And Your Honors, in this case, it is only SAFAS's construction that meets that task. We therefore ask you to vacate the final written decision and remand for application of the correct construction to the prior art. Thank you, Your Honors. Thank you. We thank both sides for the cases submitted that conclude our proceedings this morning. All rise.